**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

HERC HOLDINGS INC. AND
HERC RENTALS INC.,

Plaintiffs,

v.

MARK FORD AND SYNERGY
RENTS, LLC N/K/A OPIFEX-
SYNERGY, LLC,

Defendants.

Case No.:

_________________________________/

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs Herc Holdings Inc. and Herc Rentals Inc. (collectively, "Herc" or the "Company") bring this action for preliminary and permanent injunctive relief and monetary damages against former employee Mark Ford ("Ford") and his new employer Synergy Rents, LLC n/k/a Opifex-Synergy, LLC ("Opifex-Synergy," and together with Ford, "Defendants"). Herc alleges as follows:

**NATURE OF THE ACTION**

1. Opifex-Synergy is engaged in an ongoing and coordinated scheme to increase its national market share by poaching employees from Herc, among other competitors, at virtually every level of the organization. Opifex-Synergy is doing so in brazen disregard of the restrictive covenants included in agreements between Herc and

its employees and despite having express notice of those agreements from two prior lawsuits between the companies. Put simply, Opifex-Synergy has made a business decision that stealing its competitors' employees, placing them in positions that violate restrictive covenants, and indemnifying those employees is easier than engaging in lawful competition. Enough is enough.

2. Ford served as a Region Vice President for Herc—the senior executive leader accountable for the overall health, growth, and performance of an assigned multi-state region, with full profit-and-loss ownership across every branch in that region—and had the unique responsibility of managing the post-merger integration of H&E Equipment Services, Inc.'s ("H&E") business, assets and personnel into Herc's existing business structure with a focus in the mountain region that included Arizona, Nevada and Utah and in overall coordination with Herc's integration of H&E throughout the United States.

3. Through this role, Ford had broad access to Herc's confidential information and trade secrets, including intimate knowledge regarding Herc's business and operational processes and procedures; Herc's region-, district-, and branch-level revenue, fleet, pricing, and profit-and-loss reporting; the weekly go-to-market reporting that measured the output and outreach of every sales representative in his region; Herc's multi-year strategic plan for each location in his region; and the confidential synergy and integration reporting Herc generated for the H&E transaction. Shortly after separating from Herc, Ford began work for Opifex-Synergy in a role that, upon

information and belief, requires him to oversee competing equipment rental operations in the same multi-state region he covered for Herc and to integrate a newly acquired entity's personnel and assets into Opifex-Synergy's existing business structure, much like he did for Herc with respect to H&E.

4. Ford's hiring establishes a continuing—and escalating—pattern of conduct rather than an isolated event and confirms that Defendants' interference with Herc's contractual rights is knowing, deliberate, and certain to recur absent injunctive relief.

5. This isn't mere conjecture. This is the third action of its kind. Opifex-Synergy has recruited and hired employees of Herc and of H&E, now known as Herc Rentals, Inc., with knowledge that those employees were bound by restrictive covenant agreements with Herc or H&E, and has placed them in roles that violate those covenants. H&E previously brought two such actions: *H&E Equipment Services, Inc. v. Barnard, et al.*, No. 4:25-cv-1127 (S.D. Tex.), and *H&E Equipment Services, Inc. v. Varner, et al.*, No. 8:25-cv-00699-MSS-SPF (M.D. Fla.). Both lawsuits were resolved through a global settlement in June 2026 that required, among other things, that Opifex-Synergy notify Herc after offering a Herc employee a position.

6. Herc now asserts claims against Defendants for breach of contract, tortious interference with contract, misappropriation of trade secrets, and civil conspiracy. All causes of action arise from Ford's acceptance and performance of a senior executive position with Opifex-Synergy—an entity expressly named as a

competitor in Ford's restrictive covenant agreement with Herc—within the geographic region over which Ford had responsibility for Herc, in direct violation of his restrictive covenants and applicable law. To cease and prevent ongoing and threatened irreparable harm from Defendants' conduct, Herc seeks preliminary and permanent injunctive relief, as well as monetary damages, attorneys' fees, and other available relief.

## PROCEDURAL AND JURISDICTIONAL FACTS

### The Parties

7. Plaintiff Herc Holdings Inc. is a Delaware corporation with its principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134.

8. Plaintiff Herc Rentals Inc. is a Delaware corporation with its principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134.

9. Defendant Ford is an individual whose last known address is 23343 S. 228th Street, Queen Creek, Arizona 85142.

10. Defendant Synergy Rents, LLC n/k/a Opifex-Synergy is a Florida limited liability company with its principal place of business at 10117 Princess Palm Avenue, Suite 500, Tampa, Florida 33610. Opifex-Synergy is engaged in the business of heavy construction equipment rental and leasing.

11. Synergy Rents, LLC was organized under Florida law. On September 25, 2025, Synergy Rents, LLC registered the fictitious name "Opifex-Synergy" with the Florida Department of State, and it has since held itself out to the public, to its customers, and to Herc under that name. Upon information and belief, no entity named "Opifex-Synergy, LLC" has been separately organized or registered in Florida or in any other state. The name is a fictitious name, assumed name, or trade style that Synergy Rents, LLC and certain affiliates under the common parent Synergy Infrastructure Holdings, LLC have registered and use in common.

**Jurisdiction and Venue**

12. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this dispute because Herc's claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, raise federal questions. Herc's state law claims fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the claims relate so closely to the federal questions that those claims form part of the same case or controversy.

13. Herc consents to personal jurisdiction in this Court by filing this action.

14. The Court has personal jurisdiction over Ford because, in Section 5(a) of his Employee Confidentiality and Non-Competition Agreement—the agreement that serves as the basis for Herc's contract-based claims—Ford agreed that any action seeking to interpret or enforce that agreement "shall only be brought in either the Circuit Court of the Twentieth Judicial Circuit, Lee County, Florida, or the United

States District Court for the Middle District of Florida," consented to "the exclusive jurisdiction of such courts for such purpose," and "waive[d] any challenge to personal jurisdiction in Florida." (**Ex. 1**, Ford NCA § 5(a).) Ford further acknowledged in that Section that he would, in the performance of his duties, maintain significant contacts with Herc's corporate offices and infrastructure in Florida, including telephone and email contacts with corporate personnel, access to corporate databases and other data and intellectual property maintained in Florida, and required attendance at regular and strategic meetings in Florida.

15. In addition, throughout his employment, Ford regularly traveled to Florida to attend Herc's Region Vice President meetings, at which Herc's senior operations leadership reviewed regional performance, strategy, and confidential business plans, and Ford departed those meetings with hard-copy materials containing Herc's confidential information. In 2026, Ford also traveled to Florida to attend Herc's company-wide senior leadership meeting. Ford thus purposefully availed himself of the privilege of conducting business in Florida, and Herc's claims arise directly out of the confidential information and relationships Ford obtained through those Florida contacts.

16. The Court has personal jurisdiction over Opifex-Synergy because Opifex-Synergy is a Florida limited liability company with its principal place of business and headquarters at 10117 Princess Palm Avenue, Suite 500, Tampa, Florida, and is therefore at home in Florida and subject to the general jurisdiction of this Court. The

Court also has specific personal jurisdiction over Opifex-Synergy because Opifex-Synergy purposefully directed its conduct at Florida by hiring an employee of a Florida-headquartered company who was bound by a Florida-law agreement containing a Florida forum-selection clause.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 89(b) because a substantial part of the events or omissions giving rise to Herc's claims occurred in this District and because Ford expressly consented to venue in this District in Section 5(a) of the Ford NCA.

## STATEMENT OF FACTS

### Herc is a Premier, Full-Service Equipment Rental Company

18. Headquartered in Bonita Springs, Florida, Herc is a premier, full-service equipment rental company that provides customers the equipment, services, and solutions they need to achieve optimal performance safely, efficiently, and effectively. With nearly 60 years of equipment rental expertise, Herc serves a vast array of customer markets through company-operated branches throughout the United States and Canada.

19. In addition to Herc's principal business of equipment rental, Herc sells used equipment and contractor supplies such as construction consumables, tools, small equipment and safety supplies; provides repair, maintenance, equipment management services and safety training to certain of its customers; offers equipment re-rental services; and provides on-site support to its customers. Herc also provides

ancillary services such as equipment transport, rental protection, cleaning, refueling and labor, and offers its customers financing options for both short- and long-term rentals.

20. Herc's classic fleet includes aerial, earthmoving, material handling, trucks and trailers, air compressors, compaction and lighting, and its equipment rental business is supported by ProSolutions®, its industry-specific solutions-based services, which include power generation, climate control, remediation and restoration, pump, trench shoring, studio and production equipment, and its ProContractor professional grade tools.

21. Herc relies on its Region Vice Presidents to serve as the senior executive leaders accountable for the overall health, growth, and performance of a large, assigned multi-state region, with full profit-and-loss ownership across every branch and location in the region. The Region Vice President translates Herc's corporate strategy into regional execution, balancing short-term financial performance against long-term market share growth, talent development, and customer retention. The duties and responsibilities of the position include:

a. overseeing day-to-day operations across all branches and locations within the region, ensuring efficiency, safety, service quality, and compliance with company standards, policies, and safety protocols;

b. managing the full sales cycle—from lead generation and prospecting through sales presentations, negotiation, and deal closure—across all product lines; leading the regional sales team against aggressive growth targets, including sales process design, goal setting, pipeline management, and forecasting; owning the retention, renewal, and expansion of existing customer contracts; and establishing and managing

strategic partnerships with government agencies, universities, employers, developers, and other key accounts in the market;

c. developing and executing fleet deployment and positioning strategies that drive revenue growth and maximize equipment and vehicle utilization across the region, and closely managing fleet allocation and redeployment in response to demand shifts across markets;

d. leading, coaching, and developing district and branch managers and staff, including conducting regular performance reviews and building individualized career development plans, and fostering a high-performance, team-based culture;

e. owning the region's profit and loss, including budgeting, forecasting, and financial reporting, and ensuring compliance with Herc's sales guidance, accounting systems, and internal processes and procedures;

f. developing and executing a localized marketing plan aligned with Herc's corporate marketing strategy and brand guidelines, designing and implementing programs that increase customer engagement, usage, and referrals, and serving as a senior point of contact for customers; and

g. collaborating with Herc's corporate leadership to set the region's sales, marketing, and profitability targets, and representing Herc within the region to major customers, government agencies, industry partners, and the local community.

22. Region Vice Presidents occupy positions of significant trust and are entrusted with Herc's most sensitive strategic, pricing, customer, and personnel information for their regions, including Herc's multi-year strategic plan for each branch location in the region, region- and district-level revenue, fleet, pricing, and profit-and-loss reporting, weekly go-to-market output and outreach metrics for every sales representative in the region, and the confidential materials distributed at Herc's regular Region Vice President leadership meetings. Because the position is responsible for translating Herc's corporate strategy into regional execution and for setting the

region's sales, marketing, and profitability targets with Herc's corporate leadership, a Region Vice President necessarily learns not only Herc's current regional performance but also its forward-looking plans for the markets in the region.

**Opifex-Synergy is a Direct Competitor of Herc in a Highly-Competitive Industry**

23. The equipment rental industry serves a diverse group of customers, from individuals and small local contractors to large national accounts, providing a wide variety of rental equipment including mid-size and heavy equipment, specialty equipment, and contractor tools. The equipment rental industry is highly fragmented, with few national competitors and many regional and local operators.

24. The growth and financial health of the North American equipment rental industry is driven by a number of factors, including economic trends, non-residential construction activity, capital investment in the industrial sector, repair, maintenance and overhaul spending, government spending, and demand for construction and other rental equipment generally, including for remediation and re-building efforts related to natural disasters.

25. Opifex-Synergy is a direct competitor of Herc. Like Herc, Opifex-Synergy rents and sells general and heavy construction equipment and related products, services, and equipment-related solutions to contractors and other customers, and it maintains specialized business lines that parallel Herc's own specialty offerings, including a dedicated pump division and trench safety operations.

26. Opifex-Synergy's own public statements and public records confirm that it competes directly with Herc and that it intends to expand that competition into the western markets Ford covered for Herc. *See* Press Release, Opifex-Synergy, *Opifex-Synergy Acquires ECCO Equipment Company, LLC* (Oct. 1, 2026), available at https://tinyurl.com/4n3sebam.

27. Upon information and belief, Opifex-Synergy is focused on growing its market share in the rental business by, among other things, recruiting Herc's employees—including those who are subject to restrictive covenants—in an effort to unlawfully emulate Herc's business model by interfering with Herc's contracts and business relationships. Upon information and belief, Opifex-Synergy has pursued that same strategy against other participants in the equipment rental industry, hiring employees of competing rental companies and equipment dealers who were bound by non-competition, non-solicitation, and confidentiality obligations and using them to solicit the business of their former employers' customers. Plaintiffs contend that Opifex-Synergy has expanded its workforce and its branch footprint rapidly through a combination of acquisitions and lateral hiring of competitors' employees.

28. Opifex-Synergy's targeting of Herc's leadership is directed from the top of the organization and is not limited to Ford. Jay Vaughn III, Opifex-Synergy's chief executive officer, sent a recruiting text message directly to Robert Cowing, Herc's Chief Operations Officer, soliciting him to leave Herc for the second-ranking executive position at Opifex-Synergy. Vaughn's message states, in full:

Hey Rob,

This is Jay Vaughn, CEO of Opifex-Synergy.

I wanted to personally reach out and invite you to interview for our COO/President role — the #2 seat in the organization.

Korn Ferry will be reaching out to you and they have built a strong slate, but you are clearly differentiated and I wanted to personally text you to make sure you knew this was real and not a waste of your time.

You've got people inside your organization and outside who think the world of you, and we'll put a formal succession plan, with real teeth to protect you, in place for you to step into the CEO role so you know that you will become #1 when the time is right for me to hand it off.

We're a private company backed by Blackrock, planning to go public late next year — and we need a real CEO successor in the seat to get there who can help us tell a public markets story.

Post-IPO, we're executing a national expansion strategy, so you'd be stepping in to build a more efficient HRI/Sunbelt/URI, not maintain a strong regional player. For context: we've got the debt capacity of H&E today, we're sitting on $700M of liquidity, on track to own $1.5B of fleet OEC by year-end, our average fleet age is 29 months, and we're growing ~70% a year.

On comp — we'll make you whole on any unvested HRI stock you'd be walking away from, and we'll put an equity package in front of you built to be genuinely life-changing money. I don't want that to be the reason you say no.

I really believe this is a real wealth creation opportunity for you, and I'm hoping you'll give me the chance to make that case to you.

—Jay

29. Vaughn's message confirms that Opifex-Synergy's pursuit of Herc's senior leadership is a deliberate, company-directed strategy executed by its chief executive officer and coordinated with an outside executive search firm, and that

Opifex-Synergy is prepared to underwrite the cost to a Herc executive of leaving Herc, including by offering to "make [him] whole on any unvested HRI stock [he]'d be walking away from." Ford's hiring was one part of that strategy rather than an isolated event.

30. In late September 2026, Opifex-Synergy publicly announced that it had acquired ECCO Equipment Company, LLC from an affiliate of Hitachi Construction Machinery Co., Ltd., marking the company's entry into the Western U.S. with operations in California, Arizona, Nevada, Utah, and Idaho. With the acquisition, Opifex-Synergy now operates in 9 of the 11 largest U.S. equipment rental markets and 18 of the top 30 and nearly doubled its total addressable market. According to Opifex-Synergy, it is "knocking on the door of being a top five rental company in America," expecting to reach that position "by the end of 2027," because "[o]ur playbook works, and we're bringing it to the West."

31. Opifex-Synergy operated no branches in the western United States before the ECCO Equipment transaction. Herc does business in each of the markets Opifex-Synergy has acquired, and each of those locations is near an existing Herc branch: Boise; Las Vegas; Phoenix; Salt Lake City; San Diego; Riverside; Sacramento; Stockton; Santa Ana; and Fresno.

32. Upon information and belief, Opifex-Synergy intends to operate the acquired branches under the Opifex-Synergy name following a transition period.

33. The ECCO Equipment transaction is directly relevant to this action. Before that transaction, Opifex-Synergy operated no branches in the western United States; every branch it now operates in Arizona, Nevada, Utah, Idaho, and California came to it through that acquisition. Ford is the senior executive Opifex-Synergy placed over the integration of those branches, and he performs that work from Phoenix, Arizona—within the territory for which he had responsibility at Herc and using the unique experience he gained at Herc performing similar services. Opifex-Synergy's acquisition of operations in Ford's restricted territory, and its placement of Ford over those operations within days of his separation from Herc, are the conduct from which Herc's claims arise.

**<u>Ford's Employment with and Separation from Herc</u>**

*Employment History*

34. Herc employed Ford as a Region Vice President from June 2025 through September 2026. Prior to H&E's merger with Herc, Ford held an equivalent position with H&E.

35. As a Region Vice President, Ford performed each of the duties and responsibilities of that position described above for Herc's branches within his assigned region. Ford oversaw day-to-day operations across the branches and locations in his region; managed the full sales cycle across all product lines, led his regional sales team against Herc's growth targets, owned the retention, renewal, and expansion of existing customer contracts, and established and managed strategic partnerships with key

accounts in his markets; developed and executed fleet deployment and positioning strategies and managed fleet allocation and redeployment across his region; led, coached, and developed the district and branch managers and staff reporting to him, including through performance reviews and individualized career development plans; owned his region's profit and loss, including budgeting, forecasting, and financial reporting; executed a localized marketing plan aligned with Herc's corporate marketing strategy and served as a senior point of contact for customers in his region; and collaborated with Herc's corporate leadership to set his region's sales, marketing, and profitability targets.

36. Like Herc's other Region Vice Presidents, Ford occupied a position of significant trust and was entrusted with Herc's most sensitive strategic, pricing, customer, and personnel information for his region, including Herc's multi-year strategic plan for each branch location in his region, region- and district-level revenue, fleet, pricing, and profit-and-loss reporting, weekly go-to-market output and outreach metrics for every sales representative in his region, and the confidential materials Herc distributed at its Region Vice President leadership meetings, which Ford regularly traveled to Florida to attend. Ford's duties and authority consisted of and included "all duties, responsibilities and authority customarily performed and held by persons holding equivalent positions within the Company." (Ex. 1, Ford NCA § 2.)

37. On May 28, 2025, Ford executed an Employee Confidentiality and Non-Competition Agreement with Herc Holdings Inc. and Herc Rentals Inc., made as of

May 27, 2025, as a condition of his employment as a Region Vice President (the "Ford NCA"). (Ex. 1, Ford NCA.)

38. During his employment as a Region Vice President, Ford had responsibility for, or provided support or services in, Nevada, Utah, and Arizona, and during the 24-month period preceding his separation he also had responsibility for Idaho and California.

39. In addition to overseeing the operations of his assigned region, Ford spent the final year of his employment with Herc focused on Herc's integration of H&E Equipment Services, Inc. In that capacity, Ford attended in-person synergy meetings beginning in January 2026 devoted to Herc's synergy goals for the H&E integration, and he had access to Herc's confidential synergy reporting and integration tracking for the transaction, including the mergers and acquisitions and "Synergy Tracker" reporting maintained in Herc's internal business intelligence platform.

*The Ford NCA*

40. The Ford NCA recites that Ford entered into it in consideration of "the compensation and other benefits of the Employee's employment and continued employment with the Company, and of other good and valuable consideration to Employee, including without limitation any specialized training and continued access to the Company's confidential and proprietary information and trade secrets," and as a condition of his employment or continued employment by Herc. (Ex. 1, Ford NCA at 1.)

41. The Ford NCA provides that it "shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to conflict of laws principals thereof." (*Id.* § 5(a).) Thus, the Ford NCA is governed by Florida law.

42. The Ford NCA—which is supported by the consideration more specifically stated in the Agreement—contains the following covenants, each of which is set forth in Section 3:

a. a non-disclosure of confidential information and trade secrets provision (§ 3(a)) ("Non-Disclosure Provision");

b. a non-competition provision (§ 3(b)) ("Non-Competition Provision");

c. a non-solicitation of customers and employees provision (§ 3(c)) ("Non-Solicitation Provision");

d. a return of company property provision (§ 3(d)) ("Return of Property Provision"); and

e. a prior written notice provision (§ 3(h)) ("Notice Provision").

43. Ford expressly acknowledged that the restrictive covenants set forth in Section 3 of the Ford NCA

> are reasonable and necessary to protect and maintain the proprietary and other legitimate business interests of the Company and that the enforcement of such restrictive covenants will not prevent the Employee from earning a livelihood or impose any undue burden on the Employee or Employee's family.

(*Id.* § 3(e).)

44. The Non-Competition Provision prohibits Ford, for one year following the termination of his employment, from being employed by or rendering services to

a competitor of Herc anywhere within the geographic region for which he had responsibility:

> During the term of this Agreement and Employee's employment by the Company, and for a period of one (1) year after the termination of Employee's employment with the Company, whether said termination was voluntary or involuntary, the Employee shall not, without the prior written consent of the Company, directly or indirectly, whether as a principal, agent, officer, director, partner, employee, consultant, independent contractor or in any other capacity whatsoever, alone or in association with any other person or entity, be employed or retained by, own, manage, operate, control, partner with, be associated with, render services or assistance to, or own, share in the earnings of, or invest in the stocks, bonds or other securities of any business, firm, corporation or institution that is directly or indirectly in competition with the Company anywhere within the geographic region over which Employee had responsibility or provided support or services at the time of Employee's termination and during the twenty-four (24) month period preceding termination.

(*Id.* § 3(b).)

45. Under the Non-Competition Provision, an individual or entity "will be presumed to be in competition with the Company if the individual or entity rents or leases the same or similar types or kinds of products and/or services as those rented or leased or which were in research and development by the Company at any point during the term of this Agreement." (*Id.*)

46. Significantly, the Ford NCA defines the phrases "competition with the Company," "competitive business" and "competitor" to name Synergy Equipment expressly:

> (1) . . . Synergy Equipment . . . (2) any person, company or entity engaged in the business of renting or selling general, construction, industrial, entertainment or remediation equipment and/or services and equipment-

> related solutions, including equipment for rent or sale contained on the Company's website (www.hercrentals.com), in any of the Company's printed rental solutions guides or on Herc Rentals © applications, available for smartphones and tablets on various operating systems; (3) any person, company or entity engaged in the business of renting or selling equipment related to, or for use in, the entertainment business and/or events, including but not limited to concerts, plays, television series, studio work, movies and movie production, documentaries, sporting events or other entertainment-related business or events; (4) any person, company or entity that rents or leases the same or similar types or kinds of products and/or services as Company, including but not limited to general and/or heavy construction equipment rental, leasing and/or sharing and related services; and/or (5) any successors of the aforementioned.

(*Id.* § 3(b).)

47. Ford further acknowledged that the remedy at law for any breach or threatened breach of Section 3 would be inadequate, and agreed that Herc

> shall, in addition to all other available remedies, be entitled to injunctive relief without being required to post bond or other security and without having to prove the inadequacy of the remedies available at law. In addition, in the event a court determines that there has been a breach or threatened breach or repudiation of Section 3 of this Agreement by the Employee, the Employee agrees that in addition to injunctive relief and monetary damages, the Company shall be entitled to recover from the Employee its reasonable attorneys' fees and costs in obtaining any restraining order, preliminary or permanent injunction or any monetary judgment against the Employee.

(*Id.* § 3(e).)

48. The Non-Solicitation Provision provides that, during his employment and "for a period of one (1) year following the termination of the Employee's employment with the Company, whether said termination was voluntary or

involuntary," Ford shall not, on his own behalf or on behalf of any other person, company or entity other than Herc, directly or indirectly:

> (i) Solicit or attempt to solicit, call upon, contact, communicate with, or accept directly or by assisting others, any competitive business as described above from any current or prospective customers of the Company whom the Employee came to know, came to service, had material contact with or came to learn the identity of or about whom Employee had Confidential Information while Employee was employed by the Company; (ii) Solicit or induce, or attempt to solicit or induce, any person who is employed by the Company to leave the Company; or (iii) Aid, assist or counsel any other person, firm, corporation, entity or the like to do any of the above. Solicitations and other communications made through an online social networking website, including but not limited to Linkedin ©, Facebook © or other similar site, shall violate this Agreement to the extent they otherwise constitute the type of conduct prohibited by this Agreement.

(*Id.* § 3(c).)

49. Through the Non-Disclosure Provision, Ford covenanted and agreed, "for the duration of this Agreement and at all times following its termination," that he

> will not use or disclose (other than in furtherance of the Company's business interests during the term of this Agreement and as authorized by the Company) any confidential or proprietary information and trade secrets of the Company, including, but not limited to, customer and supplier lists, customer or prospect information, pricing information, business plans, business development plans and other strategic plans or information, contract and negotiation strategies, Company reports and analyses, Company processes, techniques and systems used or considered for use, Company financial records, sales and marketing information, patents, patent rights, inventions, trademark or trade name rights, copyrights and other intellectual property rights, techniques, know-how and trade secret information, plans or information regarding the Company's future products and services and other business and financial information of or relating to the Company or its customers (collectively, the "Confidential Information").

(*Id.* § 3(a).)

50. Through the Return of Property Provision, Ford agreed that he "will not remove or transfer any Confidential Information or any other written materials, records and documents belonging to or concerning the business of the Company from the Company's facilities or offices (including electronically) except as directed by the Company," and that upon termination of his employment or upon Herc's request he "will destroy or return all originals and copies of all Confidential Information, including, without limitation, electronic documents, USB drives, hard drives, cloud-based accounts or any other format for retention of such information," and "will not maintain any copy of any such Confidential Information on any personal cellular/mobile phones, tablets, personal computers or other electronic devices as well as backups of any such devices stored in any location." (*Id.* § 3(d).)

51. The Notice Provision required Ford, "[b]efore taking any position with any person or entity during the twelve (12) month-period following termination of Employee's employment with the Company, whether voluntary or involuntary," to "give prior written notice to the Company of the name of such person or entity, the duties, responsibilities and assigned location related to Employee's consideration of such employment." (*Id.* § 3(h).) Ford further agreed:

> Employee acknowledges and agrees that failure to provide such notice shall constitute a material breach of this Agreement and shall further constitute a presumption that the employment about which the Employee failed to provide notice violates this Section 3(b) of this Agreement.

(*Id.*)

52. The Ford NCA further provides that the period during which the Section 3 restrictions apply "shall be extended by the length of time during which the Employee is deemed to be in breach of any of the terms of this Section 3," and that Ford's Section 3 obligations "represent independent covenants by which the Employee is and shall remain bound notwithstanding any breach or claim of breach by the Company and shall survive the termination or expiration of this Agreement." (*Id.* §§ 3(g), 5(i).) The Ford NCA also provides:

> If any portion of the provisions of this Section 3 is held to be unenforceable for any reason, including but not limited to the duration of such provision, the territory being covered thereby or the type of conduct restricted therein, the parties agree that the Court is authorized and directed to modify the duration, geographic area and/or other terms of such provisions to the maximum benefit of the Company as permitted by law, and, as so modified, said provision shall then be enforceable.

(*Id.* § 3(f).)

*Ford's Separation from Herc*

53. Ford separated from Herc on September 23, 2026. Although Ford advised Herc verbally regarding his departure, he never gave Herc the prior written notice required by the Notice Provision before accepting a position with Opifex-Synergy.

54. Accordingly, Ford's non-competition and non-solicitation covenants run through September 23, 2027, subject to extension under Section 3(g) for any period during which Ford is deemed to be in breach. Ford's confidentiality and trade secret obligations are perpetual and are not subject to that one-year period.

**Prior Actions Against Opifex-Synergy**

55. Herc and Opifex-Synergy are not strangers to one another. Opifex-Synergy was a defendant in both of the prior actions identified above, each of which arose from its hiring of H&E employees who were bound by restrictive covenants. Both actions concluded in June 2026, approximately three months before Opifex-Synergy hired Ford.

56. On September 25, 2026—two days after Ford's separation from Herc and one day after Herc sent Ford the cease-and-desist letter described below—counsel for Opifex-Synergy notified Herc that Opifex-Synergy "has hired Mark Ford," that Ford "has not started employment with Opifex-Synergy yet," and that Ford's "position will be Regional President for Opifex-Synergy." (**Ex. 3**, Sept. 25, 2026 Notice.) The notice added that Ford's "initial duties" would be "focused on portions of the country outside the geographic area in which he had responsibility for Herc," and reserved Opifex-Synergy's rights as to "the validity, enforceability, scope, or applicability of any restrictive covenant Herc contends applies to Mr. Ford." (*Id.*)

57. Opifex-Synergy's notice identified Ford's name, his anticipated title, and his assignment to the "Ecco Equipment integration team," but did not identify the location or branches to which he would be assigned, instead representing that his "initial duties" would be "focused on portions of the country outside the geographic area in which he had responsibility for Herc." Three days later, Ford's own counsel disclosed that Ford would "serve as Regional President on [Opifex-]Synergy's

integration team for Ecco equipment, based in Phoenix, Arizona"—within the geographic region over which Ford had responsibility for Herc.

58. Opifex-Synergy therefore had actual knowledge of the Ford NCA, and of Herc's position that its restrictive covenants apply to Ford, before Ford began performing services for Opifex-Synergy.

**Ford's Access to Confidential Information and Trade Secrets**

59. As a Region Vice President, Ford had unique and broad access to a great deal of highly confidential information and trade secrets—information which Herc vigorously protects from competitors. Ford expressly acknowledged in the Ford NCA that, "as a result of Employee's unique position in the Company," he would "have unique and broad access to significant proprietary and confidential information and trade secrets belonging to the Company," and that "but for Employee's position in the Company, Employee would not have such access." (Ex. 1, Ford NCA § 3(a).) Herc permitted Ford to access, and he regularly used, the following categories of confidential information in performing his job duties:

a. competitive intelligence regarding Herc's competitors;

b. account strategies regarding Herc's past and/or current customers;

c. Herc's organizational, marketing, and growth strategies, including the Company's three-year strategic plan for each branch location in Ford's region, which Herc provided to Ford in hard copy in February 2026;

d. regional operational and financial information, including regional profit and loss reporting, budgeting, capital allocation, and fleet deployment data for the region Ford oversaw, as well as the weekly go-to-market reporting Herc delivered to him, which included region and district

summaries for Herc's Classic and ProSolutions lines, month-to-date output and outreach detail for every territory sales representative and ProSolutions sales representative in his region, average on-rent original equipment cost and on-rent growth, new qualifying account counts, used equipment sales, sales activity, planned activity, opportunity and subcontractor metrics measured against Herc's internal targets, go-to-market grades, and year-to-date on-rent original equipment cost;

e. information relating to Herc's acquisition and integration activity, including the integration of H&E Equipment Services, Inc., and the strategies, pricing, and operational data developed in connection with that integration, including the mergers and acquisitions and "Synergy Tracker" reporting maintained in Herc's internal business intelligence platform, which reflected baseline, task, target, and center-of-excellence revenue and synergy attainment by product line and equipment category, H&E transition and fleet health reporting, and account and geography-level acquisition data;

f. the confidential materials Herc distributed to Ford at its regular Region Vice President leadership meetings, including hard-copy strategy decks, and at the in-person synergy meetings Ford attended beginning in January 2026 concerning Herc's synergy goals for the H&E integration; customer and account lists and related information, including customer and account contact information, account parent and macro-customer hierarchies, new and qualifying account lists, customer pricing and budgetary information, and customer needs and/or requirements, among other things;

g. vendor, supplier, re-rent, and subcontractor lists, including pricing and related information;

h. information relating to contracts between Herc and its customers; and

i. pricing models, rate structures, and revenue, task, and target data by product line and equipment category, including for Herc's General Rental, ProSolutions, ProResources, ProTruck, ProContractor Tools, Trench Shoring, and Floor Care offerings.

60. The above-referenced confidential information and trade secrets, all of which Herc authorized Ford to access while he served as a Region Vice President, are

highly sensitive, commercially valuable, and would be useful to Opifex-Synergy and other competitors in their efforts to compete with Herc.

61. Herc invests substantial time, money, and other resources to develop this confidential information, and it takes (and has always taken) reasonable measures to protect it from dissemination to competitors and others outside of the company. These measures include requiring employees such as Ford to enter into restrictive covenant agreements containing confidentiality obligations, password-protected databases, and limiting dissemination of confidential and trade secret information on a need-to-know basis. Accordingly, the above-referenced trade secrets and confidential information are not generally known to the public.

62. Following Ford's separation, Herc determined that the binder containing Herc's multi-year strategic plan for each branch location in Ford's region, which Herc provided to Ford in hard copy in February 2026, is no longer present at the Herc branch at which Ford worked. Nor are the other hard-copy materials Ford would have received in connection with Herc's regional and national strategic plans, including the hard-copy strategy decks and other confidential materials Herc distributed to Ford at its Region Vice President leadership meetings and at the in-person synergy meetings Ford attended beginning in January 2026. Ford neither returned those materials to Herc nor left them behind at the branch. Upon information and belief, Ford removed Herc's hard-copy Confidential Information from Herc's facilities and has retained it since his separation, in violation of the Return of Property Provision, and his

representation that he possesses no Herc property, Confidential Information, or trade secrets is inaccurate.

63. With access to such highly sensitive confidential information and trade secrets, Ford has the knowledge necessary to engineer a strategy which would allow a competitor like Opifex-Synergy to unlawfully compete with Herc.

**Ford Accepts a Senior Executive Position with Opifex-Synergy in His Restricted Geographic Area**

64. Opifex-Synergy disclosed to Herc that it hired Ford and that his "position will be Regional President for Opifex-Synergy." Herc is further informed and believes that Ford holds the title of President with responsibility for Opifex-Synergy's western operations, including the branches Opifex-Synergy acquired through the ECCO Equipment transaction. Opifex-Synergy is a direct competitor of Herc and is named as a competitor in the Ford NCA.

65. Ford began performing services for Opifex-Synergy on September 28, 2026.

66. Counsel for Ford has represented that Ford "will serve as Regional President on [Opifex-]Synergy's integration team for Ecco equipment, based in Phoenix, Arizona." Phoenix, Arizona lies within the geographic region over which Ford had responsibility for Herc at the time of his separation, and the ten branches Opifex-Synergy acquired through the ECCO Equipment transaction all lie within the region over which Ford had responsibility or provided support or services at the time of his separation or during the 24 months preceding his separation.

67. Upon information and belief, the responsibilities Ford performs for Opifex-Synergy are the same as or similar to the responsibilities he performed for Herc, including oversight of equipment rental branch operations and the integration of an acquired equipment rental business—the very work on which Ford spent his final year at Herc.

68. On or about September 26, 2026, Ford publicly announced his departure from Herc and his new position on LinkedIn. (**Ex. 2**, Sept. 26, 2026 LinkedIn Post.)

69. Herc is further advised that Ford has stated he is "not concerned" about the Ford NCA because of an agreement Opifex-Synergy is providing to him. No indemnity or similar arrangement with Opifex-Synergy relieves Ford of his obligations to Herc. Instead, this arrangement confirms that Ford's breach is knowing and willful and that Opifex-Synergy knowingly induced it.

70. As soon as practicable after learning of Ford's acceptance of the Opifex-Synergy position, Herc sent Ford a cease-and-desist letter dated September 24, 2026, reminding him of his obligations under the Ford NCA and demanding compliance. (**Ex. 4**, Sept. 24, 2026 Cease and Desist to Ford.) Herc provided a copy of that letter to Opifex-Synergy and to its outside counsel. (*Id.*)

71. Among other things, Herc's letter demanded that Ford cease all services to Opifex-Synergy within the scope of his restrictions; identify and return all Herc property, Confidential Information, and trade secrets in his possession, custody, or control, including materials held on personal phones, tablets, computers, USB and

hard drives, cloud-based accounts, and backups; identify all Herc customers, prospective customers, and employees he had contacted since his separation and all customers he had advised of his departure before his separation; identify all Herc Confidential Information he had disclosed or made available to Opifex-Synergy; provide the written notice required by Section 3(h); produce any indemnity or similar arrangement Opifex-Synergy had provided to him; and preserve all documents and electronically stored information relating to his separation and his recruitment and engagement by Opifex-Synergy. (*Id.*)

72. Herc's letter required Ford to confirm in writing by 5:00 p.m. EDT on Monday, September 28, 2026 that he had fully complied with each demand and that he had not engaged, and would not engage, directly or indirectly, in any prohibited activity. (*Id.*)

73. Ford did not comply with Herc's demands. Instead, on September 28, 2026, outside counsel for Ford sent Herc a response letter disputing Herc's claims, asserting that no breach had occurred because Ford had not yet begun working for Opifex-Synergy when Herc's letter issued, and contending that Ford's new role "differs materially from his prior position as Region Vice President at Herc." (**Ex. 5**, Sept. 28, 2026 Response Letter.) Ford did not resign from or cease his services to Opifex-Synergy, and he represented only that he possessed no Herc property, Confidential Information, or trade secrets and that Opifex-Synergy's counsel had already supplied the notice required by Section 3(h). Ford's start date does not cure his breaches. The

Notice Provision obligated Ford to give written notice "[b]efore taking any position" with any person or entity, and that breach was complete when he accepted the Opifex-Synergy position without notifying Herc; the Notice Provision required notice from Ford himself, not from his prospective employer's counsel after the fact; the Non-Competition Provision reaches not only employment but also being "retained by," "associated with," or "render[ing] services or assistance to" a competitor; and Ford has in any event performed services for Opifex-Synergy continuously since September 28, 2026.

74. In his response, Ford declined Herc's demands that he identify his post-separation contacts with Herc customers, prospective customers, and employees; declined to identify any Herc Confidential Information he had disclosed or made available to Opifex-Synergy; declined to produce any indemnity or similar arrangement Opifex-Synergy had provided to him; and declined to confirm a litigation hold. (*Id.*)

75. Ford further disputed the enforceability of the Ford NCA's restrictive covenants, asserted that the covenants are overbroad in both geographic and activity scope, and reserved the right to challenge the Agreement's choice-of-law and forum-selection provisions, including "the right to challenge the applicability of Florida law to an Arizona resident." (*Id.*)

76. Upon information and belief, Ford was involved in soliciting Herc employees Ray Reyes and Josh Yerk to leave Herc and join him at Opifex-Synergy.

Ford's solicitation of Herc employees would unequivocally breach the Non-Solicitation Provision.

77. Herc contends that Ford is violating and will continue to violate the restrictive covenants contained in the Ford NCA.

78. Upon information and belief, Defendants are using, and will continue to use, Herc's confidential information and trade secrets to unfairly and unlawfully compete with Herc.

79. Herc has been and, upon information and belief, will continue to be harmed as the direct result of Defendants' unlawful conduct.

80. Herc alleges, upon information and belief, that Ford's actions have adversely impacted and will continue to adversely impact Herc's goodwill and profits.

81. Upon information and belief, Ford, in concert with Opifex-Synergy, intends to emulate Herc's business model by, among other things, using Herc's confidential information and trade secrets to unlawfully compete with it.

82. Herc further contends that with respect to Ford's unlawful conduct, Ford acted specifically in the interest of, and with the knowledge and support of, Opifex-Synergy.

**<u>Herc's Entitlement to Injunctive Relief</u>**

83. Herc has clearly ascertainable rights in need of protecting, including to:

a. preserve and maintain the integrity of its confidential information and trade secrets together with the goodwill and market share it expended significant time and resources to create;

b. prevent Ford from violating the bargained-for provisions contained in the Ford NCA; and

c. prevent Ford and Opifex-Synergy from unlawfully and unfairly competing with Herc.

84. The Ford NCA is a valid and enforceable contract that prohibits Ford from, among other things:

a. being employed by or rendering services to a competitor of Herc within the geographic region over which he had responsibility or provided support or services at the time of his separation and during the preceding 24 months, for one year following his separation;

b. soliciting Herc's current and prospective customers, and soliciting or inducing Herc's employees to leave Herc, for one year following his separation; and/or

c. using or disclosing Herc's confidential information and trade secrets at any time.

85. Herc fully performed its obligations under the Ford NCA.

86. Ford has engaged in and is continuing to engage in conduct that constitutes a material breach of numerous provisions in the Ford NCA and is otherwise unlawful. Upon information and belief, Opifex-Synergy is directly and/or indirectly encouraging Ford to engage in such conduct.

87. Herc has suffered and will continue to suffer irreparable harm and economic damages as a result of Ford's unlawful conduct and Opifex-Synergy's encouragement of and participation in such conduct. Moreover, Herc has an urgent need to protect its legitimate business interests.

88. There is no adequate remedy at law that might address the irreparable injury caused by Defendants' actions. Absent relief, Herc will continue to lose market share to Opifex-Synergy, directly or indirectly as a result of Ford's actions. There is no way to accurately forecast the effect on Herc's business over time or the extent of the long-term damages due to Ford's actions. Ford further acknowledged in the Ford NCA that the remedy at law for any breach or threatened breach of Section 3 would be inadequate. (Ex. 1, Ford NCA § 3(e).)

89. Herc is likely to prevail on the merits in this action. Should Herc be required to wait until a full trial on the merits to enforce its legal rights, however, it will be irreparably harmed because it will continue to lose business, goodwill, and customers that may never be recovered.

90. Injunctive relief is not contrary to the public health, safety, or welfare. Moreover, issuing injunctive relief will serve the public interest, and the harm to Herc absent the requested relief strongly outweighs the risk of harm to Ford should injunctive relief be granted. Ford expressly acknowledged that enforcement of the Section 3 covenants "will not prevent the Employee from earning a livelihood or impose any undue burden on the Employee or Employee's family." (Ex. 1, Ford NCA § 3(e).)

91. Herc has been required to retain the law firm of Ogletree Deakins to represent it in this action and has been obligated to pay the firm a reasonable fee for its services. Ford agreed that Herc "shall be entitled to recover from the Employee its

reasonable attorneys' fees and costs in obtaining any restraining order, preliminary or permanent injunction or any monetary judgment against the Employee." (Ex. 1, Ford NCA § 3(e).)

## CAUSES OF ACTION

### Count I – Breach of Contract (Ford)

92. Herc hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-91 above as if fully set forth herein.

93. The restrictive covenants contained in the Ford NCA are valid and enforceable contractual obligations between Ford and Herc. Herc bargained for, and gave valuable consideration for, Ford's adherence to the provisions of the Ford NCA.

94. Ford materially breached the Notice Provision by failing to give Herc prior written notice of the name of his prospective employer and the duties, responsibilities, and assigned location of the position before taking a position with Opifex-Synergy during the 12 months following his separation. By the express terms of the Ford NCA, that failure "constitute[s] a material breach of this Agreement" and "constitute[s] a presumption that the employment about which the Employee failed to provide notice violates this Section 3(b)." (Ex. 1, Ford NCA § 3(h).)

95. Ford's employment with Opifex-Synergy breaches the Non-Competition Provision because Ford accepted and is performing a senior executive position with Opifex-Synergy—an entity expressly named as a competitor in the Ford NCA—within the one-year restricted period and within the geographic region over which he had

responsibility or provided support or services at the time of his separation and during the preceding twenty-four months. The Non-Competition Provision is enforceable under Fla. Stat. § 542.335 because it is supported by Herc's legitimate business interests in its confidential information and trade secrets, its substantial customer relationships, and the goodwill associated with its branches and brand, and because its one-year duration and its limitation to the territory Ford himself covered are no broader than reasonably necessary to protect those interests. Ford's new role in fact sits squarely within those interests: he is based in Phoenix, Arizona, and is integrating newly acquired equipment rental branches in the same western markets he oversaw for Herc, which is the very work he performed during his final year at Herc.

96. By breaching these valid and enforceable contractual provisions in the Ford NCA, Ford has caused damages to Herc in an amount that is currently unknown but which will be calculated in discovery and before trial.

97. Upon proving these breaches and the consequent damages, Herc will seek all damages recoverable for Ford's breaches, together with its reasonable attorneys' fees and costs as provided in Section 3(e) of the Ford NCA.

**Count II – Tortious Interference with Contract**
**(Opifex-Synergy)**

98. Herc hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-91 above as if fully set forth herein.

99. The Ford NCA constitutes a valid and enforceable contract between Herc, on the one hand, and Ford, on the other.

100. Opifex-Synergy had actual knowledge of the Ford NCA and of its restrictive covenants. Herc provided Opifex-Synergy and its outside counsel with a copy of the September 24, 2026 cease-and-desist letter and a copy of the Ford NCA before Ford began performing services for Opifex-Synergy on September 28, 2026. Opifex-Synergy also acknowledged Herc's position in its September 25, 2026 notice, which expressly reserved Opifex-Synergy's rights as to "the validity, enforceability, scope, or applicability of any restrictive covenant Herc contends applies to Mr. Ford."

101. Opifex-Synergy was further on notice of Herc's restrictive covenant practices through the two prior actions brought against it by H&E Equipment Services, Inc., now known as Herc Rentals, Inc., each of which arose from Opifex-Synergy's hiring of covenant-bound Herc and H&E employees and each of which concluded in June 2026—approximately three months before Opifex-Synergy hired Ford. Opifex-Synergy nonetheless hired Ford, disclosed the hire without identifying the location or branches to which he would be assigned, and continued to employ him after receiving Herc's demand.

102. Despite its knowledge of the Ford NCA and its restrictive covenants, Opifex-Synergy engaged in intentional and unjustified interference with the Ford NCA by hiring Ford, and by continuing to employ him after receiving Herc's demand, to work in a position that violates the terms of the Ford NCA. Opifex-Synergy placed Ford on the integration team for the western operations it acquired through the ECCO Equipment transaction, within the territory Ford covered for Herc. Upon information

and belief, Opifex-Synergy further induced Ford's breach by providing him an indemnity or similar arrangement relating to his obligations to Herc.

103. Herc has been directly and proximately injured as the result of Opifex-Synergy's interference.

104. Herc is entitled to monetary damages, in an amount to be proven at trial, and to preliminary and permanent injunctive relief arising from Opifex-Synergy's unlawful conduct.

**Count III – Violations of the DTSA, 18 U.S.C. § 1836 *et seq.***
**(Ford and Opifex-Synergy)**

105. Herc hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-91 above as if fully set forth herein.

106. While employed by Herc, Ford had access to Herc's confidential and proprietary information—which constitutes trade secrets under the DTSA—including customer and account information, pricing models and rate structures, product-line revenue and target data, weekly go-to-market output and outreach reporting for the sales force in his region, region- and district-level operational and financial information, Herc's multi-year strategic plans for the branch locations in his region, and the synergy and integration reporting Herc generated in connection with its acquisition of H&E, among other things discussed above.

107. Herc derives independent economic value from its confidential and proprietary information not being known to, and not being readily ascertainable

through proper means by, another person who can obtain economic value from the disclosure or use of the information.

108. Herc's trade secrets are used in, or intended for use in, interstate commerce.

109. Herc expended substantial time, effort, money, and resources in acquiring, developing, and maintaining its confidential and proprietary information.

110. Herc takes reasonable, affirmative measures to maintain the confidentiality of this information for Herc's exclusive benefit and competitive advantage in the industry.

111. Ford had, and has, a duty not to use or disclose Herc's trade secrets for his own benefit or for that of a competitor, both under the Ford NCA and under applicable law.

112. Upon information and belief, Ford has wrongfully retained Herc's trade secrets and is using and/or disclosing such information for his benefit and that of Opifex-Synergy.

113. In the alternative, and at a minimum, Ford's knowledge of Herc's trade secrets and his performance of a senior executive role for a direct competitor in the same geographic region make disclosure or use of those trade secrets inevitable and threatened.

114. Upon information and belief, Defendants' actions were and continue to be willful and malicious.

115. As a direct and proximate result of Defendants' misappropriation of Herc's trade secrets, Herc has suffered, and will continue to suffer, irreparable harm and economic damages. Herc is thus entitled to injunctive relief, actual damages, and disgorgement of any amount by which Defendants have been unjustly enriched, in amounts to be proven at trial, together with exemplary damages and attorneys' fees as provided by 18 U.S.C. § 1836(b)(3).

**Count IV – Violations of the FUTSA, Fla. Stat. § 688.001 *et seq*.**
**(Ford and Opifex-Synergy)**

116. Herc hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-91 above as if fully set forth herein.

117. While employed by Herc, Ford had access to Herc's confidential and proprietary information—which constitutes trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001 *et seq.*—including customer and account information, pricing models and rate structures, product-line revenue and target data, weekly go-to-market output and outreach reporting for the sales force in his region, region- and district-level operational and financial information, Herc's multi-year strategic plans for the branch locations in his region, and the synergy and integration reporting Herc generated in connection with its acquisition of H&E Equipment Services, Inc., among other things discussed above.

118. Defendants have been unjustly enriched as a proximate result of the misappropriation of Herc's trade secrets.

119. As a direct and proximate result of Defendants' misappropriation of Herc's trade secrets, Herc has suffered, and will continue to suffer, irreparable harm and economic damages. Herc is thus entitled to injunctive relief, actual damages, and disgorgement of any amount by which Defendants have been unjustly enriched, in amounts to be proven at trial, together with exemplary damages and attorneys' fees as provided by Fla. Stat. §§ 688.003-688.005.

## Count V – Civil Conspiracy
## (Ford and Opifex-Synergy)

120. Herc hereby repeats, re-alleges, and incorporates by reference the allegations contained in paragraphs 1-91 above as if fully set forth herein.

121. Defendants entered into an agreement with each other to commit the unlawful acts alleged in this action.

122. Defendants engaged in overt acts in furtherance of their conspiracy or knew of the scheme and assisted in some way.

123. The underlying civil wrongs on which this claim is based are Opifex-Synergy's tortious interference with the Ford NCA and Defendants' misappropriation of Herc's trade secrets.

124. Defendants caused Herc to suffer damages.

## REQUEST FOR RELIEF

Herc respectfully requests that this Court enter judgment for Plaintiffs and against Defendants as follows:

A. Temporarily, preliminarily and permanently enjoining Ford from continuing to violate his obligations under the Ford NCA, including by enjoining him from performing services of any nature for Opifex-Synergy or any other competitor of Herc within the geographic region over which he had responsibility or provided support or services at the time of his separation and during the preceding 24 months, for the remainder of the restricted period as extended under Section 3(g);

B. Temporarily, preliminarily and permanently enjoining Ford from soliciting or attempting to solicit, calling upon, contacting, or communicating with any current or prospective customer of Herc whom he came to know, came to service, had material contact with, or about whom he had Confidential Information while employed by Herc, and from soliciting or inducing any Herc employee to leave Herc, for the remainder of the restricted period;

C. Temporarily, preliminarily and permanently enjoining Opifex-Synergy from employing or retaining Ford in any position that causes him to violate the Ford NCA and from otherwise interfering with the Ford NCA;

D. Temporarily, preliminarily and permanently enjoining Defendants from acquiring, accessing, using, disclosing, or misappropriating Herc's Confidential Information and trade secrets;

E. Ordering Ford to immediately return to Herc any and all of Herc's electronic and hard-copy Confidential Information, proprietary information, and trade secrets, and to submit to a forensic examination of any and all devices and cloud-based

accounts capable of performing computing functions or storing electronic information that are owned by, have been used by, or have been accessible to him at any time since the date six months prior to his separation, for the purpose of determining whether and how he accessed, used, disclosed, or misappropriated Herc's Confidential Information;

F. Ordering Ford to identify all Herc customers, prospective customers, and employees with whom he has had contact of any kind since his separation, including through social media, and all Herc confidential information he has disclosed or made available to Opifex-Synergy or any of its employees, agents, or advisors;

G. Ordering Defendants to preserve all documents, communications, and electronically stored information relating to Ford's separation from Herc, his recruitment and engagement by Opifex-Synergy, and any Herc information in their possession, custody, or control;

H. Awarding against Defendants actual damages, in an amount to be proven at trial, together with exemplary damages, costs and attorneys' fees as provided by Section 3(e) of the Ford NCA and by applicable law, pre- and post-judgment interest, plus any other damages available under applicable law and permanent injunctive relief; and

I. Providing such further relief as the Court deems just under the circumstances.

# AI CERTIFICATION

Pursuant to the Standing Order Regarding the Use of Generative Artificial Intelligence ("AI"), Plaintiffs, by and through the undersigned counsel, certify that generative AI was used in the preparation of this filing and that any preparation assistance was personally reviewed by the filer for accuracy and, to the extent any legal citations are in this filing, such citations reference actual, non-fictitious cases or cited authority and accurately reflect the contents of such authority.

DATED: October 7, 2026.

Respectfully submitted,

*/s/ Caren S. Marlowe*

Caren S. Marlowe, Esq.
Florida Bar No.: 514586
caren.marlowe@ogletree.com
John C. Getty, Esq.
Florida Bar No.: 1013911
john.getty@ogletree.com
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
100 North Tampa Street, Suite 3600
Tampa, FL 33602
Telephone: (813) 289-1247
Facsimile: (813) 289-6530

***ATTORNEYS FOR PLAINTIFFS***